# In the United States Court of Federal Claims

No. 16-288 C
Filed: May 19, 2016

```
*******************************************
                                          *   Bid Protest Jurisdiction,
                                          *     28 U.S.C. § 1491;
                                          *   Cargo Preference Act of 1904 ("CPA"),
TRANSATLANTIC LINES LLC,                  *     10 U.S.C. § 2631;
                                          *   Competition in Contracting Act ("CICA"),
                                          *     31 U.S.C. § 3553(c)(1);
          Plaintiff,                      *   Contract Dispute Act ("CDA"),
                                          *     41 U.S.C. § 7101 et seq.;
v.                                        *   Federal Acquisition Regulation ("FAR"),
                                          *     48 C.F.R. § 6.302-2;
THE UNITED STATES,                        *   Interested Party,
                                          *     28 U.S.C. § 1491(b)(1);
                                          *   Rules of the United States Court of
          Defendant,                      *     Federal Claims ("RCFC"),
                                          *     RCFC 12(b)(1) (Jurisdiction).
                                          *
*******************************************
```

**Scott Arnold**, Blank Rome LLP, Washington, D.C., Counsel for Plaintiff.

**Elizabeth Anne Speck**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND FINAL ORDER CONCERNING THE GOVERNMENT'S MOTION TO DISMISS

**BRADEN**, *Judge*.

I.  **RELEVANT FACTUAL BACKGROUND.**[1]

In 2012, the United States Transportation Command ("USTRANSCOM") awarded Universal Service Contract-7 ("USC-7"), Solicitation No. HTC711-11-R-W004, to twenty-eight bidders, including TransAtlantic Lines LLC ("TransAtlantic"). Compl. ¶ 1; *see also* Gov't Mot. at 2. USC-7 is a world-wide Indefinite Delivery/Indefinite Quantity ("IDIQ") contract that "provides international cargo transportation and distribution services for Department of Defense .

---

[1] The relevant facts herein were derived from the March 1, 2016 Complaint ("Compl.") and attached Exhibits ("Compl. Exs. 1–3"), and the Government's March 7, 2016 Motion To Dismiss ("Gov't Mot.") and attached Exhibits ("Gov't Mot. Exs. A–B"). *See Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999) ("Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged.").

. . cargo." Gov't Mot. at 2. The term of the USC-7 included one base year and two option years. Gov't Mot. at 2; Compl. Ex. 2 (USC-7). Because the USC-7 was scheduled to expire in 2015, USTRANSCOM decided to transfer services to the "next-generation" USC-8. Compl. Ex. 2 (USC-7); *see also* Gov't Mot. at 2. Performance of the USC-8, however, was automatically stayed for 100 days, pursuant to 31 U.S.C. § 3553(c)(1),[2] because of the post-award bid protests filed by TransAtlantic at the Government Accountability Office ("GAO"). Gov't Mot. at 2.

In light of the automatic stay, on February 22, 2016, USTRANSCOM decided to extend the USC-7, through sole-source bridge contracts, for six months, with a five percent increase for USC-7 Option Year 2 carrier rates. Compl. Ex. 3, at 2–3. That same day, TransAtlantic sent an email to USTRANSCOM to inquire whether TransAtlantic would be allowed to add inland trucking rates, *i.e.*, "late rates,"[3] on the West Azores route during the six-month extension period. Compl. Ex. 3, at 1. USTRANSCOM decided that TransAtlantic would not be able to add the inland trucking rate, because the Government was not "refreshing rates at this time." Compl. Ex. 3, at 1.

On February 25, 2016, USTRANSCOM sent TransAtlantic a proposed bilateral extension to the USC-7. Compl. Ex. 1, at 3–5. The executed contract modifications were due by March 1, 2016. Gov't Mot. Ex A; *see also* Compl Ex. 1.

On March 1, 2016, TransAtlantic signed a modification to the USC-7 and forwarded it to USTRANSCOM. Gov't Mot. Ex. A.

## II.    PROCEDURAL HISTORY.

On March 1, 2016, TransAtlantic filed a Complaint For Declaratory And Permanent Injunctive Relief alleging that USTRANSCOM's refusal to accept TransAtlantic's proposed land rates was a violation of the Cargo Preference Act of 1904[4] ("CPA") and arbitrary and capricious.

---

[2] Pursuant to Section 3553(c)(1) of the Competition in Contracting Act ("CICA"): "Except as provided in paragraph (2) of this subsection, a contract may not be awarded in any procurement after the Federal agency has received notice of a protest with respect to such procurement from the Comptroller General and while the protest is pending." 31 U.S.C. § 3553(c)(1).

[3] Section 1.4.1 of the USC-7 defined "late rates" as:

> USTRANSCOM shall not accept proposals of service and rates from Contractors that were not awarded any contracts as a result of this solicitation unless the Contractor is offering U.S. flag service or combination U.S. flag service that cannot otherwise be obtained from Contractors that were awarded contracts. In such case, paragraph 1.2 applies.

Compl. Ex. 2, at 4 (USC-7, Exhibit 2, Additional Clauses).

[4] Section 2631(a) of the Cargo Preference Act, in relevant part, provides:

> Only vessels of the United States or belonging to the United States may be used in the transportation by sea of supplies bought for the Army, Navy, Air Force, or

That same day, TransAtlantic filed a Corporate Disclosure Statement Of Plaintiff Transatlantic Lines LLC, pursuant to Rule 7.1 of the Rules of the United States Court of Federal Claims ("RCFC"), and the court convened a telephone status conference.

On March 7, 2016, the Government filed a Motion To Dismiss, pursuant to RCFC 12(b)(1), for lack of subject-matter jurisdiction. On March 14, 2016, Plaintiff filed a Response. On March 17, 2016, the Government filed a Reply.

### III.   DISCUSSION.

#### A.   Jurisdiction.

Pursuant to 28 U.S.C. § 1491(b)(1), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement.

28 U.S.C. § 1491(b)(1).

As a threshold matter, the court must consider jurisdiction before reaching the substantive merits of a case. *See Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented."). When considering a motion to dismiss for lack of subject-matter jurisdiction, the court must take the facts alleged in the complaint as true. *See Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). The court may consider evidence beyond the pleadings, however, when the motion to dismiss challenges the jurisdictional facts alleged in the complaint. *See Moyer*, 190 F.3d at 1318. If the court determines that it does not have subject-matter jurisdiction, the court must dismiss the complaint. *See* RCFC 12(h)(3); *see also Smith v. United States*, 495 Fed. Appx. 44, 47 (Fed. Cir. 2012).

#### B.   Standing.

Under 28 U.S.C. § 1491(b)(1), "[t]he party invoking federal jurisdiction bears the burden of establishing the[] elements [of standing]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992);

---

Marine Corps. However, if the President finds that the freight charged by those vessels is excessive or otherwise unreasonable, contracts for transportation may be made as otherwise provided by law.

10 U.S.C. § 2631(a).

*see also Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (same).

The United States Court of Appeals for the Federal Circuit has construed the term "interested party," under 28 U.S.C. § 1491(b)(1), as synonymous with "interested party" as it is used in 31 U.S.C. § 3551(2)(A). *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions that adopt the CICA definition of "interested party" for purposes of 28 U.S.C. § 1491(b)(1)). Therefore, to satisfy the "interested party" standard, a plaintiff must establish that: "(1) it was an actual or prospective bidder; and (2) possess[es] the requisite direct economic interest." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012) (alteration in original). As such, where the plaintiff is the awardee of the contract, it no longer has standing under 28 U.S.C. § 1491(b)(1). *See Diversified Maint. Sys., Inc. v. United States*, 103 Fed. Cl. 431, 436 (2012) (citing *Outdoor Venture Corp. v. United States*, 100 Fed. Cl. 146, 152 (2011)). Instead, once awarded a contract, objections to the terms of the contract are matters of contract administration that are properly brought as claims pursuant to the court's Contract Dispute Act[5] ("CDA") jurisdiction under 28 U.S.C. § 1491(a)(2).[6] *See Adv. Am. Constr.*,

---

[5] Section 7104(b)(1) of the Contract Dispute Act provides:

Except as provided in paragraph (2), and in lieu of appealing the decision of a contracting officer under section 7103 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.

41 U.S.C. § 7104 (b)(1).

[6] Section 1491(a)(2) of the Tucker Act provides:

To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The [United States] Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

28 U.S.C. § 1491(a)(2).

*Inc. v. United States*, 111 Fed. Cl. 205, 224 (2013) (citing *Diversified Maint. Sys.*, 103 Fed. Cl. at 436–37); *see also Outdoor Venture Corp.*, 100 Fed. Cl. at 152.

### C. Whether The Court Has Jurisdiction To Adjudicate The Claims Alleged In The March 1, 2016 Complaint.

#### 1. The Government's Argument.

The Government argues that the court does not have jurisdiction over the claims alleged in the March 1, 2016 Complaint, because TransAtlantic was a contract awardee and therefore, does not have standing to sue as an "interested party" under 28 U.S.C. § 1491(b)(1). Gov't Mot. at 4. "TransAtlantic is not a disappointed bidder that has been prejudiced by a contract award or suffered any competitive injury—indeed, it was awarded the contract." Gov't Mot. at 5 (citing *Trailboss Enters., Inc. v. United States*, 111 Fed. Cl. 338, 340–41 (2013) (dismissing a bid protest brought by contract awardee)). The United States Court of Federal Claims has "routinely dismissed complaints filed by contract awardees seeking to enjoin contracts under the [c]ourt's bid protest jurisdiction." Gov't Mot. at 5 (citing *Outdoor Venture Corp.*, 100 Fed. Cl. at 152 ("Once a bidder has received a contract, it is no longer an actual or prospective bidder or offeror with regard to a particular procurement. Instead, the bidder has become an awardee, who is not an interested party for purposes of 28 U.S.C. § 1491(b)(1)[.]"); *ABF Freight Sys., Inc. v. United States*, 55 Fed. Cl. 392, 397 (2003) (dismissing the claims of contract awardees); *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 347–48 n.6 (2013) (finding that plaintiff lacked standing to protest the management of two contracts, where plaintiff was the "eventual awardee for both")). To the extent that TransAtlantic sought to "preserve" interested party status by filing this bid protest before signing the USC-7 modification, "TransAtlantic cannot avoid that it is now a contract awardee and not a 'disappointed bidder.'" Gov't Mot. at 5–6 (citing *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1349 (Fed. Cir. 2013) (holding that the "mere timely submission of a proposal" does not "automatically[] confer[] standing under the substantial chance standard")). Therefore, the court does not have jurisdiction to adjudicate the March 1, 2016 Complaint, pursuant to 28 U.S.C. § 1491(b)(1). Gov't Mot. at 6.

The Government also argues that the court does not have jurisdiction over the claims alleged in the March 1, 2016 Complaint, because they concern matters of contract administration, governed by the CDA. Gov't Mot. at 6 (citing 41 U.S.C. § 7102(a); *Trailboss*, 111 Fed. Cl. at 341–42 ("[O]nce awarded a contract, objections to the price terms of the contract award are matters of contract administration which are properly brought as claims pursuant to this court's CDA jurisdiction under 28 U.S.C. § 1491(a)(2)."); *Kellogg Brown & Root Servs., Inc. v. United States*, 117 Fed. Cl. 764, 769 (2014) ("[W]hen a party brings a challenge in [the United States Court of Federal Claims] to an agency action which affects that party because it is a contractor and not because it is (or might be) an offeror, the only vehicle it may use is the CDA."); *Diversified Maint. Sys.*, 103 Fed. Cl. at 435–36 ("[T]o the extent that this court would have jurisdiction to hear any of plaintiff's claims alleging a breach of [a] contract—or any claim related to the administration or management of [a] contract—such a claim must be brought under the CDA.")). Under the CDA, the United States Court of Federal Claims has jurisdiction to adjudicate "any claim by or against, or dispute with, a contractor arising under [the CDA], including . . . non-monetary disputes on which a decision of the contracting officer has been issued under section 6 of the [CDA]." Gov't Mot. at 6 (quoting *Todd Const.*, 656 F.3d at 1311). Therefore, "the CDA is the exclusive

5

mechanism for the resolution of disputes arising, as here, in contract management." Gov't Mot. at 6 (quoting *Gov't Tech. Svcs., LLC v. United States*, 90 Fed. Cl. 522, 526–27 (2009)) (internal quotations omitted) (citing *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995) ("When the [CDA] applies, it provides the exclusive mechanism for dispute resolution; the [CDA] was not designed to serve as an alternative administrative remedy, available at the contractor's option.")). In this case, TransAtlantic's claim concerning USTRANSCOM's interpretation of the "late rate" provision of the USC-7, could be perceived as an attempt to allege a breach of contract claim. Gov't Mot. at 7 (citing Compl. at ¶¶ 22–23; Compl. Ex. 2). This is further evidenced by the fact that TransAtlantic seeks specific performance or an order requiring USTRANSCOM to accept TransAtlantic's "late rate." Gov't Mot. at 7 (citing Compl., Pray for Relief at ¶¶ B–E). Specific performance, however, is a remedy for breach "arising under or relating to the contract" and, therefore, TransAtlantic's claims are covered by the CDA." Gov't Mot. at 7 (citing *Todd Const.*, 656 F.3d at 1311 (defining a "claim" as "a written demand or written assertion by one of the contracting parties seeking . . . the payment of money . . . or *other relief arising under or relating to the contract*.")). Therefore, if TransAtlantic wants to contest USTRANSCOM's interpretation of the USC-7, it must file a claim with the contracting officer, and, if the claim is rejected, it may file the claim with the United States Court of Federal Claims. Gov't Mot. at 7 (citing *Trailboss*, 111 Fed. Cl. at 341 ("This court's jurisdiction to consider contract dispute claims is dependent upon the plaintiff first obtaining a contracting officer's final decision pursuant to the CDA[.]"); *KBR*, 117 Fed. Cl. at 770 ("Since no claim was submitted to the contracting officer under the CDA's requirements, *see* 41 U.S.C. § 7103(a), the matter is not within [the court's] subject matter jurisdiction.")). Accordingly, the court does not have jurisdiction to adjudicate the claims alleged in TransAtlantic's March 1, 2016 Complaint under 28 U.S.C. 1491(a)(2). Gov't Mot. at 7 (citing *Harris Patriot Healthcare Solutions, LLC. v. United States*, 95 Fed. Cl. 585, 597 (2010) (explaining that RCFC 12(h)(3) requires the court to dismiss cases when it does not have jurisdiction)).

### 2. Plaintiff's Response.

TransAtlantic responds that the court has jurisdiction to adjudicate the claims set forth in the March 1, 2016 Complaint. First, USTRANSCOM's sole-source bridge contract award is a procurement under the Tucker Act and it is well-settled that the United States Court of Federal Claims has jurisdiction to adjudicate "any alleged violation of statute or regulation in connection with a procurement or proposed procurement." Pl. Resp. at 6 (quoting *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 525 (2010)). Similarly, "[w]here a contract has expired and has no extension or option periods left, and the agency attempts to extend performance through a contract modification, this [c]ourt has jurisdiction to review bid protests related to that action." Pl. Resp. at 6 (citing *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 789 (1997); *Distributed Sols., Inc. v. United States*, 104 Fed. Cl. 368, 385 (2012)). Here, USTRANSCOM conducted a "new procurement action under the semblance of a contact modification to award a number of bridge contracts that it has deemed necessary under FAR 6.302-2."[7] Pl. Resp. at 7. The USC-7 expired,

---

[7] FAR 6.302-2, in relevant part, provides:

> When the agency's need for the supplies or services is of such an unusual and compelling urgency that the Government would be seriously injured unless the

at the very latest on February 29, 2016. Pl. Resp. at 7. On February 22, 2016, USTRANSCOM informed the USC-7 carriers that it would undertake a "bridge procurement that would require a bilateral modification because no options or extensions remained on the USC-7." Pl. Resp. at 8 (citing Compl. Ex. 3). USTRANSCOM also indicated that the terms of the USC-7 would carry over into the new contract, "essentially using the USC-7 contract as a sole source solicitation." Pl. Resp. at 8. TransAtlantic requested to add "late rates," but USTRANSCOM rejected that request. Pl. Resp. at 8. Because TransAtlantic is challenging the "propriety of that action as arbitrary and capricious under the terms of the bridge contract solicitation, unduly restrictive of competition under CICA, and a violation of the CPA," the court has jurisdiction to adjudicate this case. Pl. Resp. at 8.

Second, TransAtlantic argues that the pre-award protest was "proper and timely," because jurisdiction and standing are determined at the time the protest is filed, and the conduct TransAtlantic is complaining of, *i.e.*, "the rejection of its proposal to offer Western Azores land rates for the bridge contract, took place prior to the due date for submission of the signed bridge award." Pl. Resp. at 8 (citing *Industries for the Blind, Inc. v. United States*, 120 Fed. Cl. 132, 135 (2015) ("A party's standing is determined as of the time that suit is filed.")). As it relates to pre-award protests, "adverse action taken by an agency in response to a request by a potential offeror can be considered a protestable action," because "a party who objects to the terms of a solicitation waives its ability to file a protest on such grounds post-award." Pl. Resp. at 8 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the [United States] Court of Federal Claims.")). Therefore, the Government's argument that TransAtlantic cannot protest USTRANSCOM's rejection of the land rate is "non-sensical." Pl. Resp. at 9.

Finally, TransAtlantic argues that it is an "interested party" and has standing to file this bid protest case. Pl. Resp. at 10. "To qualify as an interested party, a protester must show that it is an actual or prospective bidder and that its 'direct economic interest would be affected by the award of the contract or by failure to award the contract.'" Pl. Resp. at 10 (quoting *Magnum Opus*, 94 Fed. Cl. at 529). To establish economic interest, "it is enough for the protestor to show that the Agency's actions denied it the ability to compete for a contract award." Pl. Resp. at 10 (citing *Magnum Opus*, 94 Fed. Cl. at 529; *K-Lak Corp. v. United States*, 93 Fed. Cl. 749, 754–56 (2010) (finding that where a plaintiff's claims relate to "the decision to procure," rather than the contract plaintiff currently held, "plaintiff has established that is has the requisite standing to pursue [a] claim under the Tucker Act"); *CCL, Inc.*, 39 Fed. Cl. at 790 ("[T]he Tucker Act contemplates a claim that a procurement *should have been* the subject of competition[.]")). In this case, TransAtlantic "is not protesting its own contract as awarded, but rather it is protesting the Agency's rejection of its proposed rates for the Western Azores route, which were not made a part of TransAtlantic's bridge contract." Pl. Resp. at 10. In addition, the fact that a contractor responds

---

agency is permitted to limit the number of sources from which it solicits bids or proposals, full and open competition need not be provided for.

48 C.F.R. § 6.302-2.

to a procurement does not mean that it is prohibited from protesting. Pl. Resp. at 10 (citing *Cubic Defense Sys., Inc. v. United States*, 45 Fed. Cl. 239, 245–48 (1999) (finding that a contractor's participation in a procurement did not waive the contractor's right to protest the procurement, where the sole-source decision denied it the ability to compete)). Moreover, at the time USTRANSCOM rejected TransAtlantic's land rates, TransAtlantic was a prospective bidder for purposes of the sole-source bridge contract. Pl. Resp. at 10 (citing *Varicon Int'l v. Office of Pers. Mgmt.*, 934 F. Supp. 440, 444 (D.D.C. 1996) ("As the plaintiffs complain that they should have been allowed to compete for a government contract, plaintiff's position in this action is analogous to that of a disappointed bidder.")). TransAtlantic's direct economic interest also was affected by USTRANSCOM's rejection of the proposed land rates, because TransAtlantic "cannot compete for bookings for the Western Azores routes which require land transportation and is, therefore, losing significant revenue associated with such work." Pl. Resp. at 11. Therefore, TransAtlantic has standing and the court has jurisdiction to adjudicate this protest claim. Pl. Resp. at 11. To the extent that the Government relies on case law to establish that TransAtlantic's claims should be considered as claims under the CDA, such reliance is misplaced, because TransAtlantic is not protesting the terms of the awarded bridge contract, but protesting USTRANSCOM's refusal to accept TransAtlantic's proposed land rates. Pl. Resp. at 11–12.

### 3. The Government's Reply.

The Government agrees with TransAtlantic, "that the contract modification is a sole-source bridge contract[,] executed pursuant to [FAR], 48 C.F.R. § 6.302-2." Gov't Reply at 2. But, the fact that there was a procurement action does not provide the court with jurisdiction to adjudicate TransAtlantic's claim, because TransAtlantic, as a contract awardee, cannot satisfy the "interested party" standard. Gov't Reply at 2 (citing 28 U.S.C. § 1491(b)(1); *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) ("[T]o come within the [United States] Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [plaintiff] is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.")). "Once [TransAtlantic] . . . received a contract, it [was] no longer an actual or prospective bidder." Gov't Reply at 2 (alterations in original) (quoting *Outdoor Venture Corp.*, 100 Fed. Cl. at 152).

In addition, none of the cases cited by TransAtlantic support the proposition that TransAtlantic "possesses standing to protest the terms of the contract that it dislikes, while also competing for task orders as a contract awardee." Gov't Reply at 3. For example, in *Magnum Opus*, the United States Court of Federal Claims determined that the plaintiff had standing to file a bid protest where the Government extended other contractors' options, but not plaintiff's. *See Magnum Opus*, 94 Fed. Cl. at 526–27, 530–31. But, the distinguishing factor is that the extension was illegal and violated CICA's requirements for full and open competition. *See id.* Accordingly, the court found that plaintiff was a prospective bidder for any new work. *See id.* In *CCL, Inc.*, the plaintiff argued that the Government's decision to expand another contractor's contract violated CICA. *See CCL, Inc.*, 39 Fed. Cl. at 789–90. The court ruled, "where a claim is made that the government violated CICA by refusing to engage in a competitive procurement, it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals." *Id.* at 790. Accordingly, the court found that plaintiff had standing as a prospective bidder, because the plaintiff showed it was interested in the work being contracted, likely would have submitted a proposal, and that by not being able to compete, it potentially lost a contract. *Id.* Unlike the plaintiffs in *Magnum Opus* and *CCL*,

TransAtlantic did not claim that USTRANSCOM's bridge contract violated CICA or that USTRANSCOM must conduct a new competition. Gov't Reply at 4. Instead, TransAtlantic "seeks to renegotiate a small piece of the contract." Gov't Reply at 4. In addition, Plaintiff's reliance on *K-Lak Corp.* also is misplaced, because in *K-Lak Corp.*, the plaintiff "was not operating as a current contract-holder while attempting to file a protest against the Government." Gov't Reply at 4 (citing *K-Lak Corp.*, 93 Fed. Cl. at 755). Therefore, these cases do not establish that TransAtlantic is an "interested party" for purposes of the court's bid protest jurisdiction. Gov't Reply at 4.

TransAtlantic does not dispute that it could resolve this matter with the Government through the CDA claim process. Gov't Reply at 5. In fact, TransAtlantic's March 14, 2016 Response brief "confirms that the parties' dispute concerns the interpretation of the USC-7 contract terms." Gov't Reply at 5 (citing Pl. Resp. at 4 n.3, 13 n.8). Nevertheless, TransAtlantic relies on several cases in an attempt to "avoid the CDA." Those cases are not applicable. Gov't Reply at 5–7. In *Blue & Gold Fleet v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007), the United States Court of Appeals for the Federal Circuit's holding concerned "whether a plaintiff waives a right to challenge the terms of a solicitation, if it fails to object to those terms prior to the close of bidding." Gov't Reply at 6. In *Industries for the Blind, Inc. v. United States*, 120 Fed. Cl. 132 (2015), "the plaintiff . . . did not sign a contract with the Government while still attempting to maintain a protest." Gov't Reply at 6 (citing *Industries for the Blind*, 120 Fed. Cl. at 134). Similarly, TransAtlantic's reliance on *Cubic Defense Sys., Inc. v. United States*, 45 Fed. Cl. 239, 245–48 (1999), for the purpose that a contractor can maintain a protest even after the contractor responds to the procurement is distinguishable, because that case "do[es] not support that a contract awardee can simultaneously accept the terms of the Government's offer while litigating a bid protest." Gov't Reply at 7 (citing *Cubic Defense Sys., Inc.* 45 Fed. Cl. at 248).

In addition, TransAtlantic's current protest is different from TransAtlantic's prior protest concerning the USC-8 at the GAO. Gov't Reply at 7. The terms of the bridge contract "were far more limited . . . because . . . it was not feasible for the Government to make all 35,000 rates subject to negotiation without putting critical Department of Defense (DoD) cargo at risk." Gov't Reply at 7–8 (citing Gov't Mot. Ex. B, at ¶¶ 4, 14). Because TransAtlantic signed the contract, "TransAtlantic must resolve its disputes regarding the contract through the CDA." Gov't Reply at 7 (citing *Trailboss*, 111 Fed. Cl. at 341 ("[O]nce awarded a contract, objections to the price terms of the contract award are matters of contract administration which are properly brought as claims pursuant to this court's CDA jurisdiction under 28 U.S.C. § 1491(a)(2)."); *Kellogg Brown & Root Servs.*, 117 Fed. Cl. at 769 ("[W]hen a party brings a challenge in [the United States Court of Federal Claims] to an agency action which affects that party because it is a contractor and not because it is (or might be) an offeror, the only vehicle it may use is the CDA.")).

### 4. The Court's Resolution.

On March 1, 2016, TransAtlantic returned the executed bridge contract to USTRANSCOM, thereby accepting the terms therein. TransAtlantic's claims concerning USTRANSCOM's rejection of TransAtlantic's proposed land rates are disputes that concern the "late rates" provisions—Paragraphs 1.1, 1.41–1.42, and 1.5—of the USC-7, that were incorporated by reference into the bridge contract. Compl. at ¶¶ 24–26; Compl. Ex. 3. Therefore, TransAtlantic's dispute is a matter a contract administration, that must be adjudicated pursuant to

the CDA. *See Diversified Maint. Sys.*, 103 Fed. Cl. at 435–36 ("[T]o the extent that this court would have jurisdiction to hear any of plaintiff's claims alleging a breach of [a] contract—or any claim related to the administration or management of [a] contract—such a claim must be brought under the CDA."); *see also Outdoor Venture Corp.*, 100 Fed. Cl. at 152 ("Contract awardees . . . must . . . bring contract claims pursuant to the [CDA.]"). As such, TransAtlantic does not have standing under the bid protest provisions of 28 U.S.C. § 1491(b)(1) to challenge the terms of the bridge contract. *See Diversified Maint. Sys., Inc.*, 103 Fed. Cl. at 436–37 (quoting *Outdoor Venture Corp.*, 100 Fed. Cl. at 152). To the extent TransAtlantic seeks to challenge USTRANSCOM's denial of the Western Azores land rates, it must bring that claim, pursuant to the CDA, and follow the appropriate procedures for filing such a claim, *i.e.*, TransAtlantic must first submit the claim to the contracting officer for a final decision before being filing it at the United States Court of Federal Claims. *See* 28 U.S.C. § 1491(a)(2).

## IV. CONCLUSION.

For these reasons, the court grants the Government's March 7, 2016 Motion To Dismiss. The Clerk of the Court is directed to dismiss TransAtlantic's March 1, 2016 Complaint.

**IT IS SO ORDERED.**

                                              s/ Susan G. Braden
                                              **SUSAN G. BRADEN**
                                              **Judge**